IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |
|---|---|
| Lowell Harris,<br><br>      Petitioner,<br><br>vs.<br><br>Warden Lyneal Wainwright,<br><br>      Respondent. | CASE NO. 1:21-cv-0860<br><br>DISTRICT JUDGE<br>Charles Esque Fleming<br><br>MAGISTRATE JUDGE<br>James E. Grimes Jr.<br><br>**REPORT &<br>RECOMMENDATION** |

Lowell Harris filed a Petition under 28 U.S.C. § 2254 for a Writ of Habeas Corpus. Doc. 1. Harris is currently in custody at the Marion Correctional Institution serving an aggregate sentence of 18 years to life imposed by the Cuyahoga County Court of Common Pleas in State v. Harris, Case No. CR-18-628118-A. The Court referred this matter to a Magistrate Judge under Local Rule 72.2 for the preparation of a Report and Recommendation. For the following reasons, I recommend that the Court dismiss Harris's petition.

### Summary of underlying facts

In habeas corpus proceedings brought under 28 U.S.C. § 2254, factual determinations made by state courts are presumed correct. 28 U.S.C. § 2254(e)(1). "This presumption also applies to the factual findings that [a] state appellate court makes on its review of the state trial record." *Johnson v. Bell*,

525 F.3d 466, 474 (6th Cir. 2008). The petitioner has the burden of rebutting

that presumption by clear and convincing evidence. *Id.*

The Ohio Court of Appeals for the Eighth Appellate District summarized

the evidence presented during Harris's trial as follows:

> {¶5} A jury trial commenced on May 2, 2019, during which the following witnesses testified on behalf of the state: (1) Clarence Perry, the victim's nephew; (2) Charles Carter; (3) Sherrai Watkins ("Sherrai"), the victim's daughter; (4) Tiffany Parker, the victim's coworker; (5) Latoya Watkins ("Latoya"), the victim's daughter; (6) Michael Stewart, paramedic; (7) Eric Croft, Cleveland police officer; (8) Tommy Manson, Cleveland police detective; (9) David Borden, Cleveland police detective; (10) Wade Westerfield, U.S. Marshals Service task force officer; (11) Cheryl Schwebs; (12) Anthony Jadud; (13) Denise Walker-McCall; (14) Dr. Andrea McCollom, deputy examiner with the Cuyahoga County Medical Examiner's office; (15) Loundon Hardy, the victim's son; and (16) Curtiss Jones, Cuyahoga County Medical Examiner's trace evidence supervisor. Harris testified on his own behalf.

> {¶6} Clarence Perry, the victim's nephew, worked with the victim and her son, Kareem, at Larchwood Nursing Home. Perry stated that Kareem has Down syndrome and lives with his mother and Harris (who Perry also called "Derek"). Perry testified that on April 17, 2018, at 7:00 a.m., he arrived at work to find that Holly had not yet arrived, which was unusual for Holly. When Kareem arrived at 10:00 a.m. without Holly, Perry became concerned. Perry testified that he and his boss phoned Holly several times but got no answer. Perry then asked Tiffany Parker to drive him to Holly's house on Emery Avenue. Kareem gave Perry a key to Holly's house.

> {¶7} Upon arriving at Holly's house, Perry entered the home just past the door and into the living room and called for Holly, Harris, and their dogs. When

2

Perry got no response, he went to his grandmother's house, which is one block away. Perry saw Sherrai and Carter at his grandmother's house, and they all expressed concern over Holly's whereabouts. Perry and Carter then returned to Holly's house and began calling Holly's name. Perry testified that Carter then knocked on the bedroom door and broke the door in when he received no response. Perry saw his "auntie laying there," bloody, on the side of the bed. Both men ran out of the house upon seeing Holly. Perry testified that he saw Sherrai enter the bedroom, and she held her mother and cried. Perry also saw other family members and Parker enter Holly's bedroom at that time. Perry did not see any firearms in the bedroom, and he testified that he did not remove anything from Holly's room, nor did any of the other family members who entered the room. Perry stated that Parker called 911.

{¶8} Carter, Sherrai's boyfriend, lived one street away from Holly. Carter testified that Holly lived with her son, Kareem, "three or four dogs" belonging to Harris, and Harris. Carter stated that Holly owns a jeep, but Harris drove it. When Harris was not driving the jeep, he would park it at the end of the driveway, blocking people from entering.

{¶9} Carter testified that Perry came to his house on the morning of April 17, 2018. They both returned to Holly's house where they found no jeep and no dogs. Both Carter and Perry entered the home and called for Holly. When they received no response, Carter phoned Holly. He thought he heard Holly's phone ringing in the bedroom, so he tried to turn the doorknob but it was locked. He then kicked in the bedroom door and found Holly unresponsive on the floor. He did not enter the room past the door but saw Sherrai enter the room from behind him and she "reached down and grabbed her mom and lift[ed] her up and put her in her arms." Carter then walked outside, crying. Carter testified that he did not see any firearms in the room, he did not remove anything from the room, and he did not see anyone remove anything from Holly's bedroom. Carter

3

further testified that he had seen Holly the evening before and she "sounded all right" and did not seem upset.

{¶10} Sherrai, the victim's daughter, lived one street away from Holly, with her boyfriend, Carter, and her grandmother. Sherrai testified that she would typically see her mother every day, but since Holly had begun dating Harris, Sherrai stopped going to Holly's home because "everything changed when [Harris] came into the picture." Sherrai testified that Holly began meeting her children at the door, talking to them on the porch. Sherrai also stated that Harris would park the jeep at the end of the driveway so that "nobody can get in." He left just enough room to get his motorcycle in and out of the driveway. According to Sherrai, Holly also began drinking daily, as opposed to only on weekends or social occasions, and she did not appear to be happy in her relationship with Harris. Sherrai testified that Harris kept guns at the house, but Holly did not like guns or violence.

{¶11} Sherrai testified that Holly's son, Kareem, lived with Holly and was dependent upon Holly for his care because he has Down syndrome. Holly and Kareem worked together at the nursing home. Sherrai stated that Holly would wake in the morning, prepare Kareem's clothes and lunch, and leave for work, while Kareem would later take the bus to work.

{¶12} Sherrai testified that on the morning of April 17, 2018, she overheard a conversation between Carter and Perry and learned that her mother had not shown up for work. She then became concerned for her mother. Carter, Perry, and Tiffany Parker went to Holly's house to check on Holly. By the time Sherrai got dressed, Carter had returned and was in tears. Sherrai then went to her mother's house where she found her mother on her back with one arm up. She did not move her mother, but she held her in her arms. Sherrai did not see any guns or weapons in Holly's room, and she did not see anyone

4

else in the home until the ambulance arrived and the emergency responders pulled her from her mother's body. Sherrai dropped her cell phone on her mother's body when she held her.

{¶13} Tiffany Parker worked with the victim, Carter, and Kareem at the nursing home. Parker testified that on April 17, 2018, she arrived at work approximately 10:15 a.m. and Holly was not there. She "immediately started texting and calling her phone" and got no answer. Parker then drove Carter to Holly's house. Upon arriving, Carter entered the house, called out to Holly "a few times," then returned to the car. Carter asked Parker to drive him to his grandmother's house, which was the next street over. Parker waited in the car while Carter went inside his grandmother's house. Parker testified that shortly thereafter, Carter and another family member exited the house, got into a different vehicle, and headed to Holly's house. Parker followed them to the house.

{¶14} Parker testified that by the time she had arrived at Holly's house, she saw Carter and other family members exit the house yelling and crying. After learning that Holly had been killed, Parker asked Carter to take her into the house, where she observed Holly with blood "coming down off her face." Parker testified that she did not see any weapons near Holly, nor did she see anyone exit the house with weapons. After running out of the house, Parker called 911.

{¶15} Latoya, one of Holly's children, spoke with Holly the evening before Holly's death. Latoya could tell that Holly had been drinking but stated that she "seemed fine." She stated that Holly did not have a problem with drinking. Latoya testified that she did not have any concerns that Holly might want to harm herself in any way. Latoya also testified that Holly told her she thought Harris was cheating on her with a woman in Atlanta.

{¶16} Latoya typically called her mother every morning on the way into work, but on the morning of April 17, 2018, Holly did not answer her call. Later that morning, her sister's boyfriend, Carter, called Latoya, asking her if she had spoken with Holly that morning. When she told him that she had not, Carter advised that he was going to check on Holly. When Carter called back, he was screaming. After speaking with Carter, Latoya threw her phone and began to cry. A coworker then drove Latoya home, and Latoya drove on to Holly's house. When she arrived, she observed detectives and other family members on the scene.

{¶17} Michael Stewart, a paramedic with Cleveland Emergency Medical Service, responded to a call regarding a gunshot on Emery Avenue on April 17, 2018. Upon arriving at the scene, he found the victim "slumped against [the] bed," with a gunshot wound to the neck, "just below the jaw," and "blood spatter" near the victim's body. Stewart testified that the victim's body was cold, no weapon was found, and the room was "disheveled, cluttered." He further stated that there were "a lot of people milling about" and the police eventually ushered the family members into the living room.

{¶18} Cleveland police officer Eric Croft responded to the scene on April 17, 2018, where he observed other first responders and distraught family members. Officer Croft secured the scene and looked for evidence. The officer testified that he did not observe any weapons on the scene and did not observe anyone remove a firearm from the home.

{¶19} Cleveland police detective Tommy Manson also responded to the scene and collected evidence. He observed forced entry into the bedroom and a female victim lying on her back on the bedroom floor "with a defect under her left jaw." The detective also observed blood spatter on the bed and a sandal with suspected blood that was tucked under the bed. Detective Manson testified that aside from a .22 caliber rifle found leaning against the bed, he did not

locate any other weapons. He did not recover any shell casings.

{¶20} Cleveland police detective David Borden, who responded to the scene on April 17, 2018, and was assigned to investigate Holly's death, testified concerning his training and experience. He has been a law enforcement officer for 23 years and has been assigned to the homicide unit since 2012. Over the course of his employment with the Cleveland Police Department, he attended multiple training seminars and received extensive firearm training.

{¶21} Upon arriving on the scene, Detective Borden observed that other first responders had already secured the crime scene. The detective spoke with the other officers on the scene, gathered information regarding their initial investigation, viewed the crime scene and the victim, and interviewed individuals on the scene. He observed the victim lying on the bedroom floor with a gunshot wound to her left neck and "pool of blood" under her head.

{¶22} Detective Borden learned that Harris, a jeep, and dogs were missing from the home. While canvassing the neighborhood, the detective located the missing jeep and ultimately had it towed and processed for evidence. During the course of his investigation, the detective identified Harris as a suspect and obtained a warrant for his arrest. Detective Borden notified the Ohio Violent Offender Task Force to begin searching for Harris.

{¶23} Wade Westerfield, a task force officer for the U.S. Marshals Service, learned through his investigation that Harris was staying at a friend's home on Royalton Road in Columbia Station. And on April 20, 2018, the U.S. Marshals surrounded the home. Before knocking on the door, a female resident exited the house and inquired as to what was going on. When shown a picture of Harris, the woman advised the officers that Harris was inside, in the bathroom. When Harris did not respond to the officers, the officers entered the home and

discovered Harris in the bathroom with the door closed. Ultimately, Harris surrendered.

{¶24} Cheryl Schwebs lives on Royalton Road in Columbia Station with her husband, Robert. Her husband is a retired master builder and mechanic who builds and repairs motorcycles and has previously worked on Harris's motorcycle. Schwebs testified that on April 17, 2018, Harris came to the Schwebs' home to have his motorcycle fixed and he wanted to help Robert work on it. Harris stayed with the Schwebs until he was apprehended on April 20, 2018. Schwebs observed law enforcement officers surround her house on April 20. She went to the front door before the police forcibly entered the home and she spoke with the officers, confirming that Harris was in the bathroom inside her home.

{¶25} Anthony Jadud is an auto mechanic with D&K Automotive, which is located on Bellaire Road in Cleveland. Jadud testified that he noticed a maroon jeep parked in front of the auto shop on Bellaire Road when he arrived for work at approximately 8:15 a.m. the morning of April 17, 2018. He recognized this jeep as belonging to Harris because he had worked on the jeep previously. He testified that he did not believe the jeep was normally parked in that location.

{¶26} Denise Walker-McCall grew up with Holly, and in April 2018, Holly lived just behind her. Walker-McCall testified that she did not see Holly's jeep parked on the street when she arrived home from work at about 4:30 p.m. on April 16, 2018, nor did she see it when she went to bed at about 10:15 p.m. She stated that she always looks outside at night before bed "[to] make sure [her] door is locked and everything is okay outside of [her] house." Walker-McCall testified that she was certain the jeep was not in the street when she retired for the evening. She also testified that when she awoke at approximately 7:00 a.m. the next morning and opened her curtains, she saw the jeep on the street.

8

Walker-McCall stated that the maroon jeep is not typically parked on the street in front of her house.

{¶27} Dr. Andrea McCollom, deputy medical examiner with the Cuyahoga County Medical Examiner's Office, conducted the autopsy on Holly. Dr. McCollom testified that Holly suffered a gunshot wound to her left neck with an exit wound in her left upper back. She explained that the bullet entered the left side of her neck below the jaw, "transected" the left carotid artery, fractured her fifth and sixth vertebrae, and "transected" the spinal cord. Dr. McCollom stated that Holly would have been immediately paralyzed by the gunshot and "would not [have been] able to move purposefully" thereafter. Dr. McCollom further testified that the bullet traveled "left to right, toward the back and downward" in Holly's body.

{¶28} Dr. McCollom also testified concerning the stippling and fouling that occurs when a gun is fired. She explained that fouling is "soot deposition onto the skin" and occurs when the muzzle of a handgun is within 12 inches from its target. Stippling is "the abrasion made by those unburned gunpowder particles" and occurs when the muzzle of the gun is within 3 feet of the target. Dr. McCollom testified that there was no fouling on Holly's skin, but there was stippling. Thus, Dr. McCollom opined that the muzzle of the handgun was between 12 inches and 3 feet away from Holly when it was fired, stating that "[i]t's closer to 3-feet than it is to 1-foot because they're so far spread apart." The determination of the exact distance is not possible, though, because the gun was not recovered.

{¶29} Finally, Dr. McCollom testified that the cause of death was a gunshot wound to the neck "with vascular spinal cord and skeletal injuries," and the manner of death was homicide. Dr. McCollom ruled out suicide for several reasons. She stated that there was no gun near the victim's body or at the scene, nor was there fouling on the victim's skin, which would indicate the gun was close to her body. Dr.

McCollom stated that "because there's no fouling or — and the stippling is far away — in order for her to have shot the gun herself, she would have to hold it pretty far away from her body, and it would be impossible for her to do that." On cross-examination, however, Dr. McCollom conceded that "if [the victim is] holding it, like normal, * * * and it's way far out, it could be possible." Dr. McCollom also ruled out suicide because of the injury sustained, stating that "[u]sually [with] a suicide [it is] a contact wound either to the head or chest or near contact for it to cause death."

{¶30} Dr. McCollom also ruled out accidental death because there was insufficient evidence at the scene to make that conclusion. Dr. McCollom noted that Holly's blood alcohol content was .211 at the time of her death, which was more than two times the legal limit.

{¶31} Four days after Holly's body was discovered, Harris was apprehended at the home of Cheryl and Robert Schwebs in Columbia Station. Detective Borden testified that Harris was in possession of a "burner" phone, which the detective stated is a prepaid cell phone that Harris had purchased the day after Holly's death. The cell phone was analyzed and, according to the detective, the analysis revealed that Harris had researched California, Illinois, and burner phones on it.

{¶32} Detective Borden also interviewed Harris, who provided an explanation for Holly's death. The detective testified that he compared Harris's statement to the crime scene photos and other evidence from the scene. He noted that the photos do not depict blood stains on the bed and it did not "look like anybody was in that bed." When asked about Harris's explanation regarding Holly's location when the gun "discharged," Detective Borden stated as follows: "He said he was on the bed on his half, which would have been closer to the window, and she was on her half, lying on the bed, which you can see from the photos there's a lot of blood. And if she was

10

shot on the bed, lying on the bed, there would be blood staining on the bed. * * * There's not."

{¶33} And when asked about Harris's explanation "for how and who was holding the gun at the time [the gun] 'discharged,' " the detective stated as follows, "Well, he said that she was holding the gun below her head turned around with her thumbs in the trigger, so that would give an upward trajectory of the bullet that was expelled from the gun." Detective Borden explained that "the wound that Holly sustained is not an upward trajectory." He continued:

> If it was truly being held like this (indicating) by Holly, when the gun discharged you would expect the bullet to go up through her neck and come out through the back of her neck or out the back of her head and either go up into the ceiling or continue on until a loss of energy and fell on the floor.

> That's not the injury she sustained.

> You can see the burn mark. It's at a downward angle and it goes out — comes out the middle of her back, in the back, so the firearm had to be above her.

{¶34} Detective Borden further testified that the cell phone recovered from Holly's clothing was also analyzed. The detective stated that the last text messages sent from Holly's phone were to Harris on April 16, 2018. These messages include, "Sorry, can't do this. Say I owe you wish I'm going to pay you, but what about the bitch you sending gifts to?" — sent at 7:22 p.m., and "I'm done," sent at 7:23 p.m.

{¶35} Loundon Hardy, Holly's son, was one of the individuals who entered Holly's home the morning of April 17, 2018. He testified that he did not enter past the bedroom door because he was in shock as he watched his sister "holding [his] mom in a pool full of blood." Hardy stated that he did not remove

11

anything from Holly's house that day and he did not
see a gun. Hardy also testified that he helped clean
his mother's house after Harris was arrested and he
threw out Harris's belongings, including a magazine
with ammunition, but neither he nor his family
members "touched [Holly's] room."

{¶36} Curtiss Jones, the trace evidence supervisor
with the Cuyahoga County Medical Examiner's
Office, performed a trace metal detection test to
determine whether Holly had handled a metal
object, such as a gun. Jones noted there was "no
reaction observed on either hand."

{¶37} Jones also conducted a gunshot residue test on
Holly to determine whether she had fired a gun, had
been in close proximity to a firearm at the time it
was fired, or touched a surface containing primer
residue. Jones stated that he looks for "gunpowder
grains" on a decedent's clothing, which are
equivalent to stippling on skin, to determine the
muzzle-to-target distance. He found powder grains
on Holly's shirt but no fouling. Jones therefore
concluded that "[t]he presence of the powder grains
and the reaction from the chemical testing * * * is
suggestive of an intermediate or closer muzzle-to-
target distance," which Jones explained was one to
three or four feet away, "maybe out to 5 feet
potentially."

{¶38} Harris testified on his own behalf. He
previously served as a city dog warden, a military
police officer in the U.S. Army, club security, and
numerous assorted jobs thereafter. Harris was
trained in the use of firearms during his military
service. Harris had known Holly before his military
service and was reunited with her years later, when
he returned to Cleveland. According to Harris, Holly
allowed Harris to move in with her after his mother
died. He described his relationship with Holly as
platonic, although they shared a bed. Harris
testified that he would sleep on top of the covers and
use his own blanket if he was cold. Harris stated that

there were other rooms in the house where he could have slept.

{¶39} Harris stated that he and Holly had different expectations for their relationship, explaining that he had to repeatedly tell Holly that he was not her boyfriend. Harris reported that Holly "carried a torch all those years" for him, but Harris did not share those feelings. He explained that he was still mourning the death of his previous girlfriend and his mother, and that his living with Holly was temporary and came with "no strings attached." On cross-examination, however, Harris conceded that he told the detectives that he had been dating Holly "for the last couple of years." When asked about the inconsistency, Harris indicated that he simply "went along with what [the detective] implied."

{¶40} According to Harris, Holly used to drink alcohol only on weekends but then began drinking every day. And it was Holly's idea that Harris park at the end of her driveway so that family members could not "park the car and disappear." Harris had no interest in getting to know Holly's family members, and he would retreat to the bedroom when they came over. In response to a question regarding a text wherein Holly sounded upset about a woman in Atlanta, Harris stated that the woman from Atlanta was a friend.

{¶41} Harris testified that on the morning of April 16, 2018, he awakened at 4:00 a.m., made lunch, and took care of the dogs. He took Holly to work then caught the 6:12 a.m. bus to his job. When he arrived home after work at approximately 7:30 p.m., Holly was not home. He took care of the dogs, made himself some dinner, and fell asleep in the bedroom.

{¶42} Harris stated that he awakened, startled, to Holly "going on and off about other women." He began to get dressed, telling Holly, "I'm leaving. I don't want to do this anymore." He then stated what happened next:

> I felt her weight on the bed and the next thing I hear is the gun cocking, and I turned around and I look over my shoulder. We're sitting on the bed; not laying in the bed, sitting on the bed.
>
> And I turned around and she's pointing the gun at me. I closed my eyes and I said, "Don't do this. Please don't do this." And then she turns the gun around and points it at herself.

{¶43} Harris testified that after a few seconds, Holly turned the gun on herself, holding the gun with both hands, with "her thumbs in the trigger," pointing the gun. Harris explained that he tried to take the gun away, placing his right hand on top of the gun, trying not to "jerk it" or "plane it." He further stated that because the gun was cocked, he attempted to "get [his] hand or [his] thumb near the hammer so it couldn't go off," but Holly then "eased up on her grip," and Harris "had one hand on [the gun for] a hot second and it went off." He stated that the shell never ejected.

{¶44} Harris then testified that he panicked, thinking "they're not going to believe I didn't do this. * * * They're not going to believe me. They're going to think I did something to her." He left the gun on the bed where "it dropped."

{¶45} Harris also testified that the first thing he thought about was moving his dogs because he knew he would be arrested. He also had a "hind thought" to move his motorcycle. And he moved the bike to the same place he moved the dogs. After dropping the dogs off, Harris parked the jeep on Brookfield Road, where it was discovered. Harris later made arrangements to get the bike to Robert Schwebs's house. He never thought about Holly's son, Kareem, who was home at the time. And he "left the scene of a horrible crime." He arrived at the Schwebs' home at approximately 10:00 p.m. on Tuesday.

{¶46} Harris testified concerning the guns he kept in the home. He admitted that he was not permitted to possess guns due to a prior conviction, but he kept a gun "because of all the activity on the streets." He stated that although he had possession of three guns, he did not own all of them. He had a .38 revolver that he kept in a lock box; a 9 mm handgun; and a .22-caliber pellet gun that belonged to his mother's boyfriend, which he kept next to the bed.

{¶47} According to Harris, he kept the loaded 9 mm gun under a pillow in the bedroom, "or in the bed," when he was home and in a lock box when he was not home. However, he also testified that when the grandchildren came over, Holly would move the gun. When asked why Holly would need to move the gun if it was in a lockbox, Harris answered, "Because it was not in the lock box. * * * I did keep it in there. It wasn't in there that particular time." And on cross-examination, he further stated that he "wasn't sure if it was under the pillows or under the [bed]spread, but it should have been somewhere in that area."

{¶48} Harris testified on direct examination that his cell phone was not working because the dogs chewed it. But during his interview with the detectives, Harris never told the detectives that the phone was not working; rather, he told them only that he threw the phone out the window. When asked on cross-examination regarding the discrepancy, Harris stated that he thought he "clarified that later." Harris testified that he did not call 911, stating, "[s]he was already dead. * * * I was panicked." III. Evid.R. 701

*State v. Harris*, 2020-Ohio-4461, 2020 WL 5558060, at *1–8 (Ohio Ct. App. 2020).

## Procedural background

*Trial court proceedings*

In May 2018, a Cuyahoga County grand jury issued a five-count indictment charging Harris with: murder, in violation of Ohio Revised Code § 2903.02(A); murder, in violation of Ohio Revised Code § 2903.02(B); felonious assault, in violation of Ohio Revised Code § 2903.11(A)(1); grand theft, in violation of Ohio Revised Code § 2913.02(A)(1); and having weapons under disability, in violation of Ohio Revised Code § 2923.13(A)(2).[1] Doc. 8-1, at 4–6. The first four counts included one- and three-year firearm specifications under Ohio Revised Code §§ 2941.141(A) and 2941.145(A). *Id*. at 4–6. Harris pleaded not guilty. Doc. 8-1, at 7.

In October 2018, Harris waived his right to a jury trial on the count alleging having a weapon under a disability. Doc. 8-1, at 9. On the same day, he moved the trial court to 'terminate" his representation and appoint new counsel. *Id*. at 11–15. Harris then executed a waiver of his right to counsel, *id*. at 17, and, following a hearing, the trial court found him "competent to represent himself," *id*. at 16. The trial court, however, soon appointed the public defender's office as stand-by counsel. *Id*. at 18. In December 2018, Harris reversed course and the trial court appointed public defenders Mark Spadaro and Lisa Rankin to represent him. *Id*. at 24.

---

[1] The trial court later granted the State's motion to dismiss the count alleging grand theft. Doc. 8-1, at 8.

Harris's jury trial took place in May 2019. *See* Doc. 8-1, at 25. After the State rested, Harris moved under Ohio criminal rule 29 for acquittal, which the trial court denied. *Id.* at 26. Harris again moved for acquittal after the defense rested. *Id.* at 32. The trial court denied Harris's renewed motion. *Id.*

At the end of Harris's trial, the jury found him guilty of all charges. *Id.* at 33. At the later sentencing hearing, the trial court found that the two murder charges and the felonious assault charge merged for sentencing purposes. *Id.* at 34. The State then elected for the court to sentence Harris on the first murder count. *Id.* The court also found that the firearm specifications merged. *Id.* The court sentenced Harris to (1) 15 years to life on the murder count; (2) three years on the firearm specification to run before and consecutive to the sentence on the murder count; and (3) three years on the having-weapons-under-disability count to run concurrently. *Id.* Finally, the court appointed James J. Hofelich as Harris's appellate counsel. *Id.* at 35.

*Direct appeal*

Harris's counsel filed a timely notice of appeal with Ohio's Eighth District Court of Appeals. Doc. 8-1, at 36. In his supporting brief, he raised three assignments of error:

> 1. The trial court erred when it denied appellant's motion for acquittal under Crim. R. 29 because the charges are not supported by sufficient evidence.
>
> 2. Appellant's convictions were against the manifest weight of the evidence.

> 3. The trial court erred in permitting expert testimony from a lay witness in violation of Evid. R. 701.[2]

Doc. 8-1, at 64–67. The court of appeals affirmed on September 17, 2020. *Harris*, 2020 WL 5558060.

Eleven days later, Harris filed a motion to reconsider related to the lay-witness issue that he'd raised in his appeal. Doc. 8-1, at 127–36. The court of appeals denied the motion on November 20, 2020. *Id*. at 146–47.

Three days later, Harris filed with the Ohio Supreme Court a pro se notice of appeal and a motion for delayed appeal. Doc. 8-1, at 148–50. That court granted the motion for delayed appeal. *Id*. at 182. In his pro se memorandum in support of jurisdiction, Harris raised four propositions of law:

> 1. In a prosecution for murder, which is predicated on the trajectory of a bullet, is it error to allow an opinion testimony by a non-expert witness, in front of the jury, instead of dismissing the jury, in order for the court to determine the non-expert witness testimony, where such testimony is and was contrary to the expert's testimony of the Medical Examiner, thereby causing confusion amongst jurors.
>
> 2. In a prosecution for murder, which is and was predicated on the Medical Examiner's Verdict of the event being a homicide, is it error for the Medical Examiner to render a Verdict of the manner, mode and cause of death, pre-maturely, without obtaining all the relevant and pertinent facts related to the manner, mode and cause of death, especially the

---

[2] The assignments of error listed at the beginning of Harris's appellate brief do not match those found in the argument section of his brief. *Compare* Doc. 8-1, at 50, *with id*. at 64–67. The assignments of error listed above are taken from the argument section.

> Appellant's statement and the Trace Evidence
> Report.
>
> 3. In a prosecution for murder, where the State
> advances consciousness of guilt, is it error to allow
> such argument before Appellant has been evaluated
> for Post Traumatic Stress Disorder.
>
> 4. In a prosecution for murder, is it error to allow
> numerous family and friends emotional and
> speculative testimony, that does not provide any
> direct or pertinent evidence.

Doc. 8-1, at 183–93.

Harris's appointed counsel then filed a notice of appearance, Doc. 8-1, at

206, and a separate memorandum in support of jurisdiction, *id.* at 207–23. In

this filing, Harris's counsel raised two propositions of law:

> 1. A police officer may not offer an opinion about the
> "trajectory of a bullet" unless he is qualified as an
> expert and provides an expert report as required by
> Evid. R. 16(K).
>
> 2. A defendant's rights to due process and fair trial
> under the Fifth and Fourteenth Amendments to the
> United States Constitution and Sections 10 and 16,
> Article I of the Ohio Constitution are violated when
> lay witnesses are permitted to offer opinions under
> Evid. R. 701 "in areas in which it would ordinarily
> be expected that an expert must be qualified under
> Evid. R. 702."[3]

---

[3]     In her memorandum, counsel made no mention of Harris's pro se
memorandum and did not seek leave to file a revised memorandum, as the
Ohio Supreme Court's rules of practice require. *See* Ohio S.Ct.Prac.R.
3.13(B)(3). In response, the State characterized counsel's memorandum as an
amendment. Doc. 8-1, at 229–30. It argued that under Ohio Supreme Court
Rule of Practice 13(C), "the amended document supersede[d] the original." *Id.*
at 230. Because there is no such rule, this is likely a scrivener's error. Rule
*3.13(C)* provides that "[a] revised document that is properly filed under this
rule will supersede the original document, and the Supreme Court will not

Doc. 8-1, at 207–23. On March 2, 2021, the Ohio Supreme Court declined under rule 7.08(B)(4) of its rules of practice to accept jurisdiction. *Id.* at 237.

*Federal habeas proceedings*

Harris timely filed his petition for writ of habeas corpus on April 19, 2021. Doc. 1, at 15; *see Houston v. Lack*, 487 U.S. 266, 270 (1988) (holding that an imprisoned petitioner's petition is deemed filed when he places it in his prison's mailing system). He raises the following grounds for relief, which are reproduced as written:

> GROUND ONE: Denied a "fair trial" by allowing a law person to testify as an expert witness, concerning the trajectory of a bullet.
>
> *Supporting Facts*: Detective Borden, provided, "falsely," expert testimony that the "trajectory of the bullet is not an upward trajectory." "It's at a downward angle and it goes out- comes out of the middle of her back, in the back, so the firearm had to be above her." Dr. McCollom, Medical Examiner Verdict and Gross Anatomic Description, there is only 2" difference between the entrance wound and exit wound, this is after the bullet "completely fractures the Greater of the thyroid cartilage at the base. This would cause a downward trajectory, again with only that 2" difference between the entrance and exit wound, NO WHERE NEAR THE MIDDLE OF THE BACK!
>
> GROUND TWO: Denied due process and fair trial under the Fifth and Fourteenth Amendment to the United States Constitution.

consider the original document that was filed." But given that Rule 3.13(B) contemplates the above-mentioned motion for leave to file a revised memorandum, it is not clear that counsel's memorandum in support of jurisdiction was "properly filed under" the rule.

> *Supporting Facts*: Medical Examiner's verdict rendered the Next day, before any knowledge of the Defendant's claim. Allowing Detective Borden to provide false expert testimony.
> Convictions were not supported by Sufficient Evidence.
> Convictions were against the Manifest weight of the evidence.
> Gunshot residue on both hands of the alleged victim.

Doc. 1, at 5–7. Respondent Warden Lyneal Wainwright filed a return of writ in response. Doc. 8. Harris filed a traverse. Doc. 11.

## Legal Standard

Under the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, § 104, 110 Stat. 1214 (AEDPA or the 1996 Act), habeas petitioners must meet certain procedural requirements to have their claims reviewed in federal court. *Smith v. Ohio Dep't of Rehab. & Corr.*, 463 F.3d 426, 430 (6th Cir. 2006). "Procedural barriers, such as statutes of limitations and rules concerning procedural default and exhaustion of remedies, operate to limit access to review on the merits of a constitutional claim." *Daniels v. United States*, 532 U.S. 374, 381 (2001). Although procedural default is sometimes confused with exhaustion, exhaustion and procedural default are distinct concepts. *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006). Failure to exhaust applies when state remedies are "still available at the time of the federal petition." *Id*. (quoting *Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982)). But when "state court remedies are no longer available to a petitioner because

he or she failed to use them within the required time period, procedural default and not exhaustion bars federal court review." *Id.*

*Exhaustion*

A federal court may not grant a writ of habeas corpus unless the petitioner has exhausted all available remedies in state court. 28 U.S.C. § 2254(b)(1)(A); *Robinson v. Horton*, 950 F.3d 337, 343 (6th Cir. 2020). To exhaust his remedies, a state defendant with federal constitutional claims must "fairly presen[t]" those claims to the state courts before raising them in a federal habeas corpus action. *Robinson*, 950 F.3d at 343 (quoting *Duncan v. Henry*, 513 U.S. 364, 365 (1995)); *see also Fulcher v. Motley*, 444 F.3d 791, 798 (6th Cir. 2006). A constitutional claim for relief must be presented to the state's highest court to satisfy the fair presentation requirement. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845–48 (1999); *Caver v. Straub*, 349 F.3d 340, 345 (6th Cir. 2003). And a habeas petitioner must "present[] both the factual and legal basis for [the] claims to the state courts." *Hanna v. Ishee*, 694 F.3d 596, 606 (6th Cir. 2012). This means that the "'petitioner must present his claim to the state courts as a federal constitutional issue—not merely as an issue arising under state law.'" *Williams*, 460 F.3d at 806 (quoting *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984)). "'[G]eneral allegations of the denial of rights to a "fair trial" and "due process" do not "fairly present claims" that specific constitutional rights were violated.'" *Hand v. Houk*, 871 F.3d 390, 418 (6th Cir. 2017) (quoting *Slaughter v. Parker*, 450 F.3d 224, 236 (6th Cir. 2006)).

*Procedural default*

Procedural default may occur in two ways. *Williams*, 460 F.3d at 806. First, a petitioner procedurally defaults a claim by failing "to comply with state procedural rules in presenting [the] claim to the appropriate state court." *Id.* In *Maupin v. Smith*, the Sixth Circuit directed courts to consider four factors when determining whether a claim is barred on habeas corpus review due to a petitioner's failure to comply with a state procedural rule: (1) whether there is a state procedural rule applicable to the petitioner's claim and whether the petitioner failed to comply with that rule; (2) whether the state court enforced the procedural rule; (3) whether the state procedural rule is an adequate and independent state ground on which the state can foreclose review of the federal constitutional claim; and (4) whether the petitioner can demonstrate cause for failing to follow the rule and actual prejudice by the alleged constitutional error. 785 F.2d 135, 138 (6th Cir. 1986); *see also Williams*, 460 F.3d at 806 ("If, due to the petitioner's failure to comply with the procedural rule, the state court declines to reach the merits of the issue, and the state procedural rule is an independent and adequate grounds for precluding relief, the claim is procedurally defaulted.") (citing *Maupin*, 785 F.2d at 138).

Second, "a petitioner may procedurally default a claim by failing to raise a claim in state court and pursue that claim through the state's 'ordinary appellate review procedures.'" *Williams*, 460 F.3d at 806 (quoting *O'Sullivan*, 526 U.S. at 848); *see Woolbright v. Crews*, 791 F.3d 628, 631 (6th Cir. 2015)

("When a petitioner has failed to fairly present … claims to the state courts and no state remedy remains, [the] claims are considered to be procedurally defaulted."). While the exhaustion requirement is technically satisfied in this circumstance because state remedies are no longer available to the petitioner, *see Coleman v. Thompson*, 501 U.S. 722, 732 (1991), a petitioner's failure to have the federal claims considered in the state courts constitutes a procedural default of those claims that bars federal court review, *William*s, 460 F.3d at 806.

To overcome a procedural bar, a petitioner must show "cause for the default and actual prejudice as a result of the alleged violation of federal law," or show that a "fundamental miscarriage of justice" will result if the petitioner's claims are not considered. *Coleman*, 501 U.S. at 750.

*Merits review*

If a state's courts adjudicated the merits of a claim, a habeas petitioner may obtain habeas relief under 28 U.S.C. § 2254, if the petitioner can establish one of two predicates. To establish the first predicate, the petitioner "must identify a 'clearly established' principle of 'Federal law' that" has been established by a holding of the Supreme Court. *Fields v. Jordan*, 86 F.4th 218, 231 (6th Cir. 2023) (en banc); *see* 28 U.S.C. § 2254(d)(1). The petitioner must then show that state's court's adjudication "was *contrary to*," or "involved an *unreasonable application* of" that "clearly established" precedent. 28 U.S.C. § 2254(d)(1) (emphasis added); *see Fields*, 86 F.4th at 232.

To establish the second predicate, the petitioner must show that the state's court's adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the [United States Supreme] Court on a question of law or" based on "a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from th[e] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A]n 'unreasonable application of'" the Court's holdings in one that is "'objectively unreasonable,' not merely wrong; even 'clear error' will not suffice." *White v. Woodall*, 572 U.S. 415, 419 (2014) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 75–76 (2003)).

"[A] 'clearly established' principle of 'Federal law' refers to the "holdings," not "dicta," of the Supreme Court's decisions. *Fields*, 86 F.4th at 231 (quoting *White*, 572 U.S. at 419). A state court is not required to cite Supreme Court precedent or reflect an "awareness" of Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts" such precedent. *Early v. Packer*, 537 U.S. 3, 8 (2002); *Lopez v. Wilson*, 426 F.3d 339, 358 (6th Cir. 2005). If the Supreme Court has not

addressed the petitioner's specific claims, a reviewing district court cannot find that a state court acted contrary to, or unreasonably applied, Supreme Court precedent or clearly established federal law. *Carey v. Musladin*, 549 U.S. 70, 77 (2006); *see White*, 572 U.S. at 426 ("Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error.").

In determining whether the state court's decision involved an unreasonable application of law, the Court uses an objective standard. *Williams*, 529 U.S. at 410. "A state court's determination that a claim lacks merit precludes federal habeas review so long as 'fair-minded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)); *see also Bray v. Andrews*, 640 F.3d 731, 738 (6th Cir. 2011). "[A] state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington*, 562 U.S. at 103.

**Discussion**

1. *Ground one is not cognizable*

In his first ground, Harris asserts that he was denied a fair trial because the trial court allowed police detective Borden to testify as an expert witness

about the trajectory of the bullet that killed Harris's victim. Doc. 1, at 5. Harris raised this issue before the Ohio court of appeals and the Ohio Supreme Court. *See* Doc. 8-1, at 66–67, 214–18. But he raised the issue solely as one concerning Rule 701 of Ohio's rules of evidence. *See* Doc. 8-1, at 66–67, 214–18. The Ohio court of appeals thus considered the issue as an evidentiary question, rather than one raising a constitutional question:

> {¶50} Evid.R. 701 governs opinion testimony by lay witnesses. It provides that
>
> > [I]f the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.
>
> {¶51} To satisfy the first prong of Evid.R. 701, the opinion of the lay witness must be "'one that a rational person would form on the basis of the observed facts.'" *State v. Mulkey*, 98 Ohio App.3d 773, 784, 649 N.E.2d 897 (10th Dist. 1994), quoting *Lee v. Baldwin*, 35 Ohio App.3d 47, 49, 519 N.E.2d 662 (1st Dist. 1987). And where a law enforcement officer "testified as a lay witness to opinions based on his experience as a police officer, his previous investigations, and his perception of evidence at issue," this first prong is satisfied. *State v. Walker-Curry*, 8th Dist. Cuyahoga No. 106228, 2019-Ohio-147, ¶ 12, citing *State v. Grajales*, 5th Dist. Delaware No. 17CAC030020, 2018-Ohio-1124, ¶ 64.
>
> {¶52} The second prong of Evid.R. 701 requires that "the opinion * * * assist the trier of fact in understanding the testimony of the witness or determining a fact in issue." *State v. Sibert*, 98 Ohio App.3d 412, 426, 648 N.E.2d 861 (4th Dist. 1994), citing *Lee* at 49, 519 N.E.2d 662. Under this prong,

a police officer's opinion testimony may be admissible to explain a fact at issue even when it is based on specialized knowledge. *Walker-Curry* at ¶ 13; *State v. Maust*, 8th Dist. Cuyahoga No. 103182, 2016-Ohio-3171, ¶ 19.

{¶53} Under Evid.R. 701, "courts have permitted lay witnesses to express their opinions in areas in which it would ordinarily be expected that an expert must be qualified under Evid.R. 702." *State v. Primeau*, 8th Dist. Cuyahoga No. 97901, 2012-Ohio-5172, ¶ 74, citing *State v. McKee*, 91 Ohio St.3d 292, 744 N.E.2d 737 (2001). And, generally, if testimony is based on an officer's training and experience, related to the officer's personal observations during an investigation, and helpful to determine facts in issue, the testimony is properly admitted as lay testimony under Evid.R. 701. *See Maust* at ¶ 18.

{¶54} "Evid.R. 701 affords the trial court considerable discretion in controlling the opinion testimony of lay witnesses." *Grajales*, 5th Dist. Delaware No. 17 CAC 03 0020, 2018-Ohio-1124, at ¶ 60, citing *State v. Harper*, 5th Dist. Licking No. 07 CA 151, 2008-Ohio-6926, ¶ 37, citing *Urbana ex rel. Newlin v. Downing*, 43 Ohio St.3d 109, 113, 539 N.E.2d 140 (1989). We therefore review a trial court's determination of the admissibility of lay witness opinion testimony for an abuse of discretion. *State v. Allen*, 8th Dist. Cuyahoga No. 92482, 2010-Ohio-9, ¶ 46.

{¶55} Here, Detective Borden, who was one of two detectives that interviewed Harris, testified on direct examination concerning his review of the evidence in the case and Harris's statement to the police:

> Question: * * * Did you then review, Detective, the photos in the context of the information provided to you by the defendant?
>
> Answer: Yes.

28

Question: And what, if any, observations did you make in comparison with the information he provided?

Answer: Well, there's no blood stains on the bed on the mattress on top. Doesn't look like anybody was in that bed to me.

Question: All right. And with respect to the defendant's explanation for how and who was holding the gun at the time it "discharged," how does that relate to the angle of her bullet wound?

Answer: Well, he said that she was holding the gun below her head turned around with her thumbs in the trigger, so that would give an upward trajectory of the bullet that was expelled from the gun. The wound that [the victim] sustained is not an upward trajectory. If it was truly being held like this (indicating) by [the victim], when the gun discharged, you would expect the bullet to go up through her neck and come out through the back of her neck or out the back of her head and either go up into the ceiling or continue on until a loss of energy and [fall] on the floor. That's not the injury she sustained. You can see the burn mark. It's at a downward angle and it goes out — comes out the middle of her back, in the back, so the firearm had to be above her.

{¶56} We find this testimony satisfies the first prong of Evid.R. 701. Detective Borden has been a police officer for 23 years and a homicide detective since 2012. Over the course of his employment with the Cleveland Police Department, he attended multiple training seminars and received extensive firearm training. Detective Borden testified that he participates in yearly training with firearms. His testimony noted above related to his investigation of the murder and his interview with Harris. Detective Borden's testimony regarding the trajectory of the bullet was rationally based on his perception of the

29

evidence at issue in the case and particularly addressed the fact that Harris's explanation of the position of the victim did not comport with the evidence.

{¶57} We also find the detective's testimony is helpful to a clear understanding of the determination of a fact in issue: the use of a firearm and what occurs when a firearm is discharged. The detective's testimony therefore satisfies the second prong of Evid.R. 701.

{¶58} Moreover, the trial court advised the jury that Detective Borden was not an expert in forensic sciences or pathology; rather, his testimony was based upon his lengthy experience as a police officer. The court then instructed the jury to "determine what weight, if any, to give to his testimony [concerning the trajectory of the bullet]." This instruction did not "bolster" the detective's testimony, as Harris suggests. Rather, the instruction served as an explanation to the jury as to how to consider Detective Borden's testimony concerning the trajectory of the bullet.

{¶59} In light of the above, we find the trial court did not abuse its discretion in allowing Detective Borden's opinion testimony concerning the trajectory of the bullet.

*Harris*, 2020 WL 5558060, at *9–10.

With this context in mind, there are at least two problems with Harris's first ground. The first problem is that the issue is not cognizable. Simply put, Harris's issue concerns Ohio's evidentiary rules. But a state's courts decide what the state's rules of evidence mean and what they allow; federal courts have no say in such matters. *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991); *accord Cooey v. Coyle*, 289 F.3d 882, 901–02 (6th Cir. 2002) (a claim that an

"Ohio court did not apply Ohio law correctly ... is not justiciable in federal habeas proceedings"). As a result, inquiry into whether evidence was properly admitted under state law "is no part of a federal court's habeas review of a state conviction" because "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle*, 502 U.S. at 67–68; *see Bey v. Bagley*, 500 F.3d 514, 519 (6th Cir. 2007) ("a claim that the [Ohio] trial court erred in the application of [Ohio] law, specifically a ruling on evidence … is simply not cognizable on habeas review").

"[I]t is only noncompliance with *federal* law that renders a State's criminal judgment susceptible to collateral attack in the federal courts." *Wilson v. Corcoran*, 562 U.S. 1, 5 (2010) (per curiam). An evidentiary  challenge may thus warrant relief only if the ruling in question "is so egregious that it results in a denial of fundamental fairness." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). But threading this needle is difficult because "state-court evidentiary rulings" "[g]enerally" "cannot rise to the level of due process violations unless they 'offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Id*. (quoting *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000)).

Harris, however, didn't present any constitutional question to Ohio's courts as to the admission of Borden's testimony. *See* Doc. 8-1, at 66–67, 214–18. And he didn't argue to any Ohio court that Borden's testimony "'offend[ed] some principle of justice so rooted in the traditions and conscience of our people

as to be ranked as fundamental.'" *Bugh*, 329 F.3d at 512. Further, under Ohio's res judicata rule, because Harris could have raised this issue on direct appeal, it is now too late for him to raise it in Ohio's courts. *State v. Szefcyk*, 671 N.E.2d 233, 235 (Ohio 1996) (reaffirming the rule from *State v. Perry*, 226 N.E.2d 104 (1967)). Ohio's courts consistently enforce this rule, *see State v. Cole*, 443 N.E.2d 169, 170–71 (1982), and the Sixth Circuit has held that the rule is an adequate and independent state ground on which to procedurally bar review of a habeas claim, *see Coleman v. Mitchell*, 268 F.3d 417, 427–32 (6th Cir. 2001); *see also Durr v. Mitchell*, 487 F.3d 423, 432 (6th Cir. 2007). So even if this Court were to construe Harris's first ground as raising an issue of constitutional magnitude, the issue is procedurally defaulted. *See Scott v. Houk*, 760 F.3d 497, 505 (6th Cir. 2014).

To be sure, Harris could avoid this default by showing cause for the default and prejudice resulting from it. *Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003). But Harris doesn't mention cause or prejudice. *See* Docs. 1, 11. So he has forfeited any claim of cause and prejudice. *Strong v. Nagy*, 825 F. App'x 239, 243 (6th Cir. 2020).

Instead, Harris seeks to avoid procedural default by pointing to an alleged fundamental miscarriage of justice in that he claims that he is actually innocent. Doc. 11, at 5, 7; *see Lundgren v. Mitchell*, 440 F.3d 754, 763 (6th Cir. 2006). A claim of actual innocence requires the petitioner to present new evidence. *See Schlup v. Delo*, 513 U.S. 298, 324 (1995); *Cleveland v. Bradshaw*,

693 F.3d 626, 631–33 (6th Cir. 2012). Harris, however, doesn't offer new evidence. Instead, he argues about the import of the evidence that was presented. *See* Doc. 11, at 2–3, 5–6. So Harris has failed to present a valid actual-innocence claim sufficient to avoid his default. *See Ozier v. Harry*, No. 17-1803, 2018 WL 3455217, at *2 (6th Cir. June 13, 2018) (order) ("Ozier does not rely on new evidence but instead argues that the evidence presented at trial was insufficient to establish his guilt."); *Robinson v. Morrow*, No. 3:08-cv-00235, 2015 WL 5773422, at *18 (M.D. Tenn. Sept. 30, 2015) (holding that a sufficiency argument does not support an actual-innocence claim) (citing *Holloway v. Jones*, 166 F. Supp. 2d 1185, 1191–92 (E.D. Mich. 2001)).

And even putting this impediment aside, in neither his petition nor his traverse does Harris identify a deeply rooted principle of justice that the trial court allegedly violated. He also hasn't cited any Supreme Court decision—and I haven't found any—that would support the idea that the admission of Borden's testimony as lay witness testimony rather than expert testimony violates due process. So there is no basis to conclude that the court of appeals' decision on Harris's evidentiary challenge was *contrary to* or an *unreasonable application* of Supreme Court precedent. *See* 28 U.S.C. § 2254(d).

The second problem with Harris's first ground is that the Ohio court of appeals made clear that Harris's premise is mistaken, both on the facts and on the law. On the facts, the court of appeals noted that the trial court instructed "the jury that Detective Borden *was not* an expert in forensic sciences or

33

pathology."[4] *Harris*, 2020 WL 5558060, at *10 (emphasis added); *see* Doc. 7-4, at 88–89. And on the law, the court of appeals determined that Borden's testimony was properly admitted as "lay witness opinion testimony" under rule 701 of Ohio's rules of evidence. *Id*. at *9–10. Harris offers nothing to support the idea that the court of appeals' determination on these points "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law," or that it "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *See* 28 U.S.C. § 2254(d). So even if the Court reached the merits of Harris first ground, it would fail.

### 2. Ground two is procedurally defaulted in part and the remainder is not cognizable

In his second ground, Harris makes five assertions in support of his claim that he suffered a due process violation. The first and second assertions concern evidence and the third and fourth raise what amount to a sufficiency-of-the-evidence challenge. The fifth assertion—concerning gunshot residue on

---

[4]     The trial transcript reflects that as to Borden's testimony, the trial court instructed the jury that:

Detective Borden testified as to the trajectory of the path of the travel of the bullet into Holly Watkins' body. Detective Borden has no formal training in forensic sciences or pathology, and his testimony was based on his 24-years of experience as a police officer. He was not recognized by the Court as an expert witness. You will determine what weight, if any, to give to his testimony on this issue.

Doc. 7-4, at 88–89.

the victim's hands—is, as explained below, merely an aspect of Harris's sufficiency challenge.

As to the evidentiary assertions, Harris first says that his right to due process was violated when the "Medical Examiner's verdict [was] rendered the next day, before any knowledge of [his] claim." Doc. 1, at 7. This assertion is an apparent reference to the medical examiner's testimony. She testified that she prepared a report based on an autopsy she performed the day after the murder. Doc. 7-2, at 35. And in her report, the medical examiner concluded, based on her examination, that the cause of death was homicide rather than suicide or accident. *Id*. at 48–49. On cross-examination, the medical examiner agreed that when she concluded that homicide was the cause of death, she "didn't have the benefit of [Harris's] statement to the police." *Id*. at 54.

Harris never raised this issue before Ohio's courts as a federal constitutional issue. Before the court of appeals, he merely asserted—in the context of a sufficiency argument—that "[t]he Medical Examiner further conceded that her conclusion that the manner of death was a homicide was made without the knowledge of all the facts, most notably Appellant's explanation of what actually occurred on April 17, 2018." Doc. 8-1, at 65. In his pro se memorandum in support of jurisdiction before the Ohio Supreme Court, Harris merely asked in his table of contents whether it was error for the medical examiner "to render a verdict … without obtaining all the relevant and

pertinent facts … especially the Appellant's statement." [5] *Id*. at 184. In neither instance did Harris mention any federal constitutional basis for his argument. Harris thus failed to fairly present a due-process based challenge to the medical examiner's verdict. *See Williams*, 460 F.3d at 806 (holding that to fairly present an issue to a state's courts, a "petitioner must present his claim … as a federal constitutional issue—not merely as an issue arising under state law") (quoting *Koontz*, 731 F.2d at 368).

Further, given the nature of this claim—one that is based on the trial record—Harris had to raise it, if at all, on direct appeal. *See McGuire v. Warden, Chillicothe Corr. Inst.*, 738 F.3d 741, 751 (6th Cir. 2013); *Hanna v. Ishee*, 694 F.3d 596, 613–14 (6th Cir. 2012). Under Ohio's res judicata rule, it would be too late for him to raise this issue now in a post-conviction petition. *See Hanna*, 694 F.3d at 613–14. As a result, Harris has procedurally defaulted this issue. *Id*. at 614; *see Williams*, 460 F.3d at 806 ("if an Ohio petitioner failed to raise a claim on direct appeal, which could have been raised on direct appeal, the claim is procedurally defaulted.").

Additionally, even putting this default aside, this issue concerns the weight that the trier of fact should have accorded the medical examiner's conclusion. Whether a medical examiner should wait to hear a defendant's

---

[5]     Harris's second proposition of law listed in his table of contents did not fully match the corresponding argument in his memorandum. *Compare* Doc. 8-1, at 184, *with id*. at 191–92. The corresponding argument did not discuss whether it was error for the medical examiner "to render a verdict … without obtaining" Harris's statement. *See id*. at 191–92.

explanation before issuing an autopsy report is not a constitutional issue and Harris offers no basis to conclude otherwise. So this issue is not cognizable in a federal habeas petition.

Harris' second evidentiary due process issue is that Borden was "[a]llow[ed] … to provide false expert testimony." Doc. 1, at 7. The exact basis for this claim is less than clear. Harris didn't mention it in his state-court filings, he doesn't explain it in his petition or traverse, and he doesn't explain why Borden's testimony was false. Construing this assertion liberally, *see Sellers v. Morris*, 840 F.2d 352, 355 (6th Cir. 1988), Harris is using the word *false* to modify *expert*, rather than *testimony*. This interpretation is consistent with Harris's first ground and the issues he presented in state court. He is thus somewhat inartfully arguing that Borden was no expert and should not have been allowed to testify as one.

This aspect of Harris's due-process based second ground is thus simply a variation on his first ground for relief. Nothing could be gained by adding to what has already been discussed as to ground one above. Because this aspect of aspect of Harris's second ground is merely a variation on his first ground, it should be rejected for the same reasons that ground one should be rejected— procedural default.

The remainder of Harris's second ground concerns his third, fourth, and fifth due-process based assertions:

> Convictions were not supported by Sufficient Evidence.

> Convictions were against the Manifest weight of the evidence.
> Gunshot residue on both hands of the alleged victim.

Doc. 1, at 7. By its terms, the first of these three assertions concerns the sufficiency of the evidence. As it turns out, the other two also concern the sufficiency of the evidence.

Take the manifest-weight assertion. Manifest-weight arguments are not cognizable in habeas. *See Nash v. Eberlin*, 437 F.3d 519, 522 (6th Cir. 2006) (holding that a "manifest-weight-of-the-evidence claim did not raise an issue of federal law"). Courts, however, typically construe a pro petition raising this issue as asserting a sufficiency-of-the-evidence claim. *See id.*; *Thompson v. Harris*, No. 4:18-cv-2103, 2020 WL 5810020, at *8–9 (N.D. Ohio Sept. 30, 2020) (citing cases). For purposes of this petition, therefore, the manifest-weight assertion simply restates Harris's sufficiency claim.

As to the unexplained reference to gunshot residue on the victim's hands, Doc. 1, at 7, this reference apparently relates to the medical examiner's testimony on cross-examination that Harris's victim had gunshot residue on her hands. Doc. 7-2, at 55. Considering this in context, and liberally construing Harris's petition, he is attempting to support his sufficiency argument by pointing out that the victim had gunshot residue on her hands. Indeed, during closing argument, Harris's counsel argued that the presence of residue on the victim's hands supported Harris's version of events, *i.e.*, that the shooting was accidental. *See* Doc. 7-4, at 140–41.

The problem with Harris's sufficiency-based due process claim is that he didn't raise a sufficiency challenge before the Ohio Supreme Court in either his pro se memorandum in support of jurisdiction or the submission his counsel filed. *See* Doc. 8, at 183–93, 207–23. He thus failed to comply with the fair presentment requirement. *See Maples*, 340 F.3d at 437. Further, given Ohio's res judicata rule, it is now too late for Harris to raise this issue before Ohio's courts. *See Durr*, 487 F.3d at 434 (explaining that Ohio's res judicata rule applies if "a petitioner could have, but failed, to bring a claim on direct review"). Harris has thus procedurally defaulted this issue. *See Hanna*, 694 F.3d at 614; *Williams*, 460 F.3d at 806.

Harris could avoid this procedural default by showing "'cause for the default and prejudice resulting from'" it. *See Maples*, 340 F.3d at 438 (quoting *Lancaster v. Adams*, 324 F.3d 423, 436 (6th Cir. 2003)). He could also show "'that a miscarriage of justice will result from enforcing the procedural default in [his] case.'" *Id*. (quoting *Lancaster*, 324 F.3d at 436).

Although Respondent raised procedural default in his return, Doc. 8, at 18, Harris does not assert cause or prejudice in his traverse and has thus forfeiting any argument about cause and prejudice, *Strong*, 825 F. App'x at 243. Instead, Harris asserts that he is actually innocent. Doc. 11, at 5, 7. But Harris merely asserts that his sufficiency and manifest-weight arguments show that he is actually innocent, *id*. at 7; he doesn't supply any actual "new evidence of innocence," *Schlup*, 513 U.S. at 316. And without new evidence,

39

there is no basis for this "court to reach the merits of [Harris's] barred claim." *Id*.; *see Ozier*, 2018 WL 3455217, at *2 ("Ozier does not rely on new evidence but instead argues that the evidence presented at trial was insufficient to establish his guilt."); *Robinson*, 2015 WL 5773422, at *18 (holding that a sufficiency argument does not support an actual-innocence claim).

The Court should reject Harris's second ground for relief.

\* \* \*

Harris raises new issues in his traverse, including denial of funding for an expert and ineffective assistance. *See* Doc. 11, at 1–6. But issues that are first raised in a traverse are forfeited. *See Tyler v. Mitchell*, 416 F.3d 500, 504 (6th Cir. 2005); *Dothard v. MacLaren*, No. 13-15217, 2015 WL 470585, at *26 (E.D. Mich. Feb. 3, 2015). So the Court need not consider them.

### Conclusion

For all the reasons set forth above, I recommend the Court deny Harris's petition.

Dated: December 8, 2023

*/s/ James E. Grimes Jr.*
James E. Grimes Jr.
U.S. Magistrate Judge

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–531 (6th Cir. 2019).